David LINDER, et al., Plaintiffs,

v.

Adolfo CALERO–PORTOCARRERO, et al., Defendants.

Misc. Nos. 94–146 SSH, 94–149 SSH.

United States District Court, District of Columbia.

June 12, 1998.

Ursala Werner, Powell, Goldstein, Frazer & Murphy, Washington, DC, for Plaintiffs.

Asst. U.S. Atty. W. Mark Nebeker, U.S. Attorney's Office, Washington, DC, for Defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on plaintiffs' motion for an expanded search, the Federal Bureau of Investigation's ("FBI") response, the Central Intelligence Agency's ("CIA") response, and plaintiffs' replies. Upon consideration of the entire record, the Court denies plaintiffs' motion in part and grants it in part as modified. An appropriate Order for each case accompanies this Opinion.

## BACKGROUND

The movants in this case are plaintiffs in a civil suit in the Southern District of Florida, *Linder v. Calero–Portocarrero*, No. 88–702, which seeks damages for the death of Benjamin Linder, a family member. Linder was a United States citizen working as an engineer on an electricity development project in El Cua, Nicaragua. On April 28, 1987, Linder was killed at San José de Bocay, Nicaragua, allegedly by members of a Nicaraguan Democratic Force ("FDN") patrol. His death was allegedly part of a campaign by counter-revolutionary organizations to terrorize the Nicaraguan population by attacking, torturing, and executing development, technical, and medical workers. Plaintiffs allege that defendants played prominent roles in the formation and operation of these counterrevolutionary organizations, namely the FDN, the United Nicaraguan Opposition ("UNO"), and the Nicaraguan Resistance ("RN") (collectively the "contra organizations").

On September 30 and October 6, 1993, plaintiffs served subpoenas on the CIA and the FBI, respectively, requesting fifteen categories of documents.[1] Plaintiffs requested all documents generated between January 1, 1984, and January 1, 1989, concerning the FDN, UNO, and RN; the four defendants, Adolfo Calero–Portcarrero, Enrique Bermúdez–Varela, Aristides Sánchez–Herdocia, and Indalecio Rodríguez–Alaniz; Benjamin Linder; the April 28 El Cua attack and all persons involved in the attack; and the formation, operation, and command of the Franciso Rodriguez Task Force, the Juan Castro Regional Command, and the Rafael Herrera Operational Command. In addition, the subpoenas requested all documents discussing similar attacks in the region of northern Jinotega, Nicaragua, as well as information regarding all "human rights" abuses committed or alleged to have been committed by the FDN, UNO, and RN, without time limitations.

The agencies challenged the subpoenas based on undue burden and privilege, thus on May 2, 1994, plaintiffs moved for an order compelling compliance with the subpoenas. On August 2, 1994, the Court denied plaintiffs' motion to compel, ordering the parties to submit suggestions for a modified subpoena and sample searches of the relevant information. The parties were unable to agree on the proper scope of a modified subpoena,[2] and the Court issued a modified subpoena based on the government's version which covered the following categories of information:

(1) all information generated between January 1, 1984, and December 31, 1988, concerning Benjamin Linder;

(2) all information generated between January 1, 1987[,] and December 31, 1988, on the March 28, 1987, attack on the El Cua hydroelectric plant and the April 28,

---

1. Neither agency is a party to the Florida case.

2. Plaintiffs' requested version was almost identical to plaintiffs' current request for an expanded search. *Compare* Pls.' Revised Subpoena and Proposed Search and Briefing Schedules of October 14, 1994, at Attachment A, *with* Pls.' Mot. for Expanded Search of April 30, 1998, at 1–2.

1987, attack on San José de Bocay in which Benjamin Linder was killed;

(3) all information generated between April 1, 1986, and April 30, 1988, concerning contra attacks at the following locations in Nicaragua: El Cua, San José de Bocay, Northern Jinotega, and Quebrada Grande;

(4) all information generated between October 1, 1986, and October 31, 1987, on Adolfo Calero–Portocarrero, Enrique Bermúdez–Varela, Aristides Sánchez–Herdocia, and Indalecio Rodríguez–Alaniz.

*See* Mem. Or. of Dec. 12, 1994, at 3.

On August 21, 1995, plaintiffs submitted a "Motion for Further Relief" requesting, *inter alia*, that the Court order the CIA and the FBI to "conduct a further search for documents concerning the policy and practice of defendants' forces toward civilians, wounded, prisoners of war and foreigners working in Nicaragua." *See* Mot. for Furth. Relief of August 21, 1995, at 1. The Court denied plaintiffs' motion on December 6, 1996, holding that the search would impose an undue burden on the agencies which outweighed the relevance of the requested information.

After the Court denied any further relief with respect to the CIA on June 24, 1997, David Linder, the father of Benjamin Linder,

appealed. In addition to challenging various privileges claimed by the CIA,[3] David Linder "challenge[d] the district court's December 1996 denial of his family's request to expand the scope of the subpoenas to include documents concerning the policies and practices of the contra organizations regarding civilians, the wounded, prisoners of war, and foreigners working in Nicaragua." *Linder v. Department of Defense*, 133 F.3d 17, 23 (D.C.Cir.1998). The Court of Appeals reversed this Court's December 1996 Order denying "the Linders' request to expand the scope of the CIA and FBI subpoenas" because (1) the Court of Appeals believed the Court did not consider the relevance of the requested documents to all the theories of plaintiffs' case,[4] and (2) the Court did not have man-hour estimates for the CIA.[5] *Id.* at 23–25.

## STANDARD OF REVIEW

■ A party generally "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action .... [or which] appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R.Civ.P. 26(b)(1). A subpoena for relevant information may be modified or quashed en-

3. The Court's December 1996 Order denying plaintiffs' motion for further relief was not a final order because it did not resolve the merits of the CIA's and FBI's privilege claims. The CIA privilege issues were resolved in the Court's June 1997 Order, but the FBI's privilege claims were still outstanding when David Linder appealed these cases and the related cases involving the Department of State and the Department of Defense. On appeal, David Linder waived any objection to the FBI's privilege claims, therefore the Court of Appeals held that it had jurisdiction over the appeal of both the CIA and FBI cases. *Linder v. Department of Defense*, 133 F.3d 17, 23 (D.C.Cir.1998).

4. The Court of Appeals was apparently under the misconception that this Court did not consider the relevance of the search identified in plaintiffs' 1995 motion for further relief to plaintiffs' "indirect" theory of the liability of defendants in the Florida case. On the contrary, when the Court denied plaintiffs' motion for further relief, it was well aware of plaintiffs' rationale for requesting the information. Rather, the Court concluded that the undue burden the additional searches would place on the agencies outweighed the

marginal relevance of the information. The Court intended the reference to its 1994 Memorandum Order modifying the subpoenas to convey this fact. *See* Op. of December 6, 1996, at 26 (referencing the Court's December 12, 1994, Memorandum Order, at 2, in which the Court concluded that documentary evidence of plaintiffs' allegations that "defendants, in their capacities as leaders of the contra organizations, *approved or otherwise ratified* the activities relating to the attack that caused Linder's death, or *ratified directives issued* to any persons concerning the attack ... would be identified in the searches proposed by the agencies," and therefore no more extensive search was needed) (emphasis added). However, in light of the Court of Appeals' apparent misunderstanding of the Court's rationale, the Court sets forth clearly the steps it is taking in evaluating plaintiffs' new requests.

5. The Court only had man-hour estimates for the FBI (and the Department of State in a related case) when it determined that the additional search would be an undue burden on the agencies. The Court inferred that the CIA would have a burden similar to the other agencies. The Court of Appeals disagreed with this inference.

tirely if the request for information is unreasonable or oppressive. *See* Fed.R.Civ.P. 45(c)(3)(A)(iv); *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C.Cir. 1984). The burden of proving that a search for information would be unduly burdensome is on the party moving to quash. *Northrop*, 751 F.2d at 403; *Westinghouse Electric Corp. v. City of Burlington*, 351 F.2d 762, 766 (D.C.Cir.1965).

## ANALYSIS

Plaintiffs' motion for an expanded search requests the following information:

1. All documents concerning Benjamin Linder;

2. All documents concerning the March 24, 1987, attack on the El Cua hydroelectric plant where Mr. Linder worked and the April 28, 1987, attack on San José de Bocay in which he was killed;

3. All documents concerning contra activities in El Cua, San José de Bocay and the Jinotega region between April 1, 1986, and April 30, 1988;

4. All documents concerning the four named defendants, Adolfo Calero Portocarrero, Enrique Bermúdez Varela, Aristides Sánchez Herdocia, and Indalecio Rodríguez Alaniz, between April 1, 1986, and April 30, 1988;

5. All documents concerning the following twelve named individuals:

Augustus Rivera Zamora, alias Mapuchin

Vincente Hernandez Garcia, alias Agustin

Santiago Giron Meza, alias William

Pedro Lopez Torres, alias Alberto

Ramon Herrera Palma, alias Estrella

Julio Antonio Garmendia Cordero, alias Negro

Alejandro Gonzales Medina, alias Alcides

Alejandro Flores Gonzales, alias Erasmo

Encarnacion Baldiva Chavarria, alias Tigrillo

Rufo Cesar Zeledon Castilblanco, alias Rolando

Jose Danilo Galeano Rodas, alias Tiro Al Blanco

Jose Santos Aguilera Sanchez, alias Gavilan;

6. All documents concerning the following contra units between October 1, 1986, and October 30, 1987:

Franciso Rodriguez Task Force

Juan Castro Regional Command

Rafaela Herrera Operational Command;

7. All documents concerning the human rights policies and practices of the following contra organizations:

Nicaraguan Democratic Force (FDN)

Unified Nicaraguan Opposition (UNO)

Nicaraguan Resistance (RN); and

8. All documents concerning the command structure of the following contra organizations between April 1, 1986, and April 30, 1988:

Nicaraguan Democratic Force (FDN)

Unified Nicaraguan Opposition (UNO)

Nicaraguan Resistance (RN).

Pls.' Mot. for Expanded Search of April 30, 1998, at 1–2. Both the CIA and the FBI object to this search on the grounds that it goes beyond the scope of the Court of Appeals' remand and is unduly burdensome. Moreover, the CIA claims that plaintiffs should be required to compensate the agency for the cost of any further searches.

### A. *Scope of Court of Appeals' Remand*

█ The parties disagree on the scope of the Court of Appeals' remand in this case. The agencies contend that plaintiffs are limited to requesting an expanded search for documents concerning the policy and practice of defendants' forces toward civilians, wounded, prisoners of war and foreigners working in Nicaragua.

It is well-established that "a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time." *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 250

(D.C.Cir.1987) (citing *Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071, 1089–93, 1102–03 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 951 (1985)); *see also* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction § 4478 (1981). Plaintiffs chose to appeal only the Court's "December 1996 denial of [their] request to expand the scope of the subpoenas to include documents concerning the policies and practices of the contra organizations regarding civilians, the wounded, prisoners of war, and foreigners working in Nicaragua." *Linder*, 133 F.3d at 23. Thus, plaintiffs have waived any objection to the Court's December 1994 modification of their original subpoena.[6] The Court will only consider plaintiffs' request for an enlarged search insofar as it seeks "documents concerning the policy and practice of defendants' forces toward civilians, wounded, prisoners of war and foreigners working in Nicaragua." *See* Pls.' Mot. for Further Relief of August 21, 1995, at 1.

■ Defendants further contend that only category 7 of plaintiffs' most recent request for an expanded search falls within the scope of the remand because it is the only request which mentions what are characterized (without a usable definition) as the human rights policies and practices of contra organizations. The Court, however, concludes that only categories 1 (requesting all documents concerning Benjamin Linder) and 8 (requesting documents concerning the command structure of the contra organizations) fall outside the scope of the Court of Appeals' remand. The remaining requests, insofar as they may turn up documents discussing or illustrating the contra "human rights" policies, are arguably within the scope of the remand.

## B. Plaintiffs' Requested Expanded Search Is Unduly Burdensome, and Therefore Will Not Be Enforced as Written

■ As the Court of Appeals intimated, plaintiffs' new request for documents concerning the contra organizations' human rights policies are relevant to the second two theories of the plaintiffs' case in Florida within the meaning of Federal Rule of Civil Procedure 26(b)(1).[7] Defendants complain, however, that the requested expanded search is unduly burdensome because it is overly broad and compliance would require the expenditure of too many resources.

A request for relevant information may be denied if the request is unreasonable or oppressive. *See* Fed.R.Civ.P. 45(c)(3)(A)(iv); *Northrop*, 751 F.2d at 403. The burden of proving that a search for information would be unduly burdensome is on the party requesting relief from the subpoena. *Linder*, 133 F.3d at 23; *Northrop*, 751 F.2d at 403.

6. Plaintiffs argue that their August 1995 motion for further relief did not waive their right to request a search for all eight categories of information, because the motion for further relief mentioned the proposed modified subpoena which the Court rejected in December 1994. The Court agrees that, had plaintiffs' appeal included the Court's modification of plaintiffs' subpoena, all eight categories might well properly now be before the Court. Plaintiffs, however, chose to appeal only the Court's refusal to expand the search to include information about the "human rights" policies and practices of the contras, thereby waiving any objection to the Court's refusal to enforce their version of the modified subpoena.

7. Plaintiffs' second two theories are that:

(b) The torture and murder of Benjamin Linder was carried out in compliance with and pursuant to FDN policy and practices of widespread torture, summary execution and inhuman and degrading treatment directed against civilians, prisoners of war, and those placed *hors de combat*, ordered, approved, authorized, directed, and ratified by [defendants]. Defendants, as direct commanders of the FDN, are responsible for the murder and torture of Benjamin Linder by individuals under their command, who were acting pursuant to policies and practices established, approved, or ratified by defendants.

(c) Alternatively, defendants Calero, Rodriguez and Sanchez had knowledge that the FDN executed wounded and defenseless persons, persons placed *hors de combat*, and tortured the wounded. Despite this knowledge and their power as the leaders and commanders of a centrally directed and hierarchically structured military organization to stop these practices, they failed to take steps to stop such practices. Their failure to do so constituted knowing participation in a conspiracy to murder and torture Linder.

*Linder v. Calero*, 747 F.Supp. 1452 (S.D.Fla. 1990) (Plaintiffs' Third Amended Complaint ¶ 40(b) & (c)).

"Whether a burdensome subpoena is reasonable 'must be determined according to the facts of the case,' such as the party's need for the documents and the nature and importance of the litigation." *Linder*, 133 F.3d at 24 (quoting *Northrop*, 751 F.2d at 407). Moreover, Rule 45(c) (delineating the circumstances justifying quashing a subpoena) was "not intended to diminish rights conferred by Rules 26–37." *See* Fed.R.Civ.P. 45 Adv. Comm. note to 1991 Amendment; *see also Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1023 (Fed.Cir.1986) (noting that Rule 45 must be read in light of Rule 26(b)); 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d § 2452 (1995). Accordingly, factors to be considered in the undue burden analysis include relevance, the need of the party for the documents, whether the request is cumulative and duplicative, the time and expense required to comply with the subpoena (relative to the responder's resources), and the importance of the issues at stake in the litigation. *See* Fed.R.Civ.P. 26(b)(2);[8] *Williams v. City of Dallas*, 178 F.R.D. 103, 110–11 (N.D.Texas 1998) (listing factors); *United States v. International Business Machines Corp.*, 83 F.R.D. 97, 104 (S.D.N.Y. 1979) (listing factors and citing cases).

The Court concludes that plaintiffs' request for an expanded search is unduly burdensome, considering all the relevant factors.

Although plaintiffs' litigation addresses a significant issue concerning the safety of American workers employed abroad in a wartime setting, with the exception of category 7, records responsive to plaintiffs' expanded search would only be marginally relevant.[9] Moreover plaintiffs' need for such a sweeping search was reduced by the agencies' search in compliance with the modified subpoena of 1994; information generated by that search (particularly the information responsive to the request for documents mentioning contra attacks at various locations in Nicaragua and the four named defendants), undoubtedly supplied plaintiffs with indirect evidence of the relevant policies and practices of the affected contra organizations.

■ The agencies have "describ[ed] the precise nature of [their] burden[s]" in a number of ways. *Linder*, 133 F.3d at 24. "Undue burden can be found when a subpoena is facially overbroad." *Williams*, 178 F.R.D. at 109; *see also IBM*, 83 F.R.D. at 106–107. Although most of the documents requested may be technically relevant within the meaning of Rule 26(b)(1), two of the categories of information are totally outside the scope of the Court of Appeals' remand. *See supra*, Pt. A. The first four categories of plaintiffs' requested expanded search are almost exactly the same as the search which the agencies have already performed, except that the new search eliminates any time restrictions.[10]

---

8. Federal Rule of Civil Procedure 26(b)(2) provides in relevant part:

> The frequency or extent of use of the discovery methods ... permitted under these rules ... shall be limited by the court if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; ... [or] (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

9. Even a search encompassing only category 7 will generate many irrelevant documents, because plaintiffs' requested search does not contain time limitations. Although the Court agrees that documents about certain contra policies during the time period at issue in this case are

relevant, the so-called human rights policies of the contra organizations years before or after the attack on Benjamin Linder are not. *See IBM*, 83 F.R.D. at 107 ("A demand for documents should cover a reasonable time period to insure that the materials desired are sufficiently identified and to confine the search to relevant documents."). Moreover, the use of the undefined term "human rights policies" would result in the production of documents discussing "human rights policies" with no relevance whatsoever to the Linder case.

10. For example, the agencies previously searched for "all information generated between January 1, 1987[,] and December 31, 1988, on the March 28, 1987, attack on the El Cua hydroelectric plant and the April 28, 1987, attack on San José de Bocay in which Benjamin Linder was killed." *See* Mem. Or. of Dec. 12, 1994, at 3. Plaintiffs now request that the agencies perform exactly the same search without a time limit. *See* Pls.' Mot. for Expanded Search of April 30, 1998, at 1–2.

Moreover, any information about the policies of the contras which could conceivably be discovered by searches encompassing categories 2–6 should also be discovered by a single search similar to category 7. Thus, enforcing plaintiffs' requested enlarged search would result largely in the production of information which is "unreasonably cumulative or duplicative" of information plaintiffs already have. *See* Fed.R.Civ.P. 26(b)(2).

The time and expense required for the agencies to respond to the requested expanded search, even taking into account the resources of the federal government, *see IBM*, 83 F.R.D. at 108, also support the Court's conclusion that the requested search is unduly burdensome. Whether compliance with a requested search would be unduly burdensome depends on the volume of material requested, the ease of searching for the requested documents in the form presented, *see Northrop*, 751 F.2d at 404, and whether compliance threatens the normal operations of the responding agencies. *See IBM*, 83 F.R.D. at 108.

The affidavits submitted by both agencies over the course of this litigation make it clear that responding to plaintiffs' expanded search, as written, would take an inordinate amount of time and resources. For example, William McNair, the Information Review Officer for the Directorate of Operations ("DO") of the CIA, estimated that to comply with plaintiffs' first subpoena: [11]

> [T]he volume of [CIA] records that will have to be hand-searched is potentially *over 1,000,000 pages of records.* Further, based on my experience in searching documents for information, and then processing those documents for public release, I estimate that it could take over 27 man-years of effort to (a) retrieve any responsive records and then (b) review and redact those records to protect classified information, intelligence sources and methods, and/or CIA organizational data and CIA employee names. The amount of effort

required for the [CIA] to meet the broad demands of the subpoena would significantly hamper CIA's ability to conduct other records searches not only in fulfillment of its intelligence mission, but also in support of law enforcement investigations and prosecutions, Freedom of Information Act and Privacy Act requests, Congressional demands for information, and other civil litigations, for a lengthy period of time.

Decl. of William McNair ¶¶ 9–10 (June 8, 1994) (emphasis in original) [hereinafter "McNair I Decl."]. Moreover, the most recent McNair declaration explains that it would take 7,572 man-hours to comply with just a part of category 7 of plaintiffs' request for an expanded search. Decl. of William McNair ¶ 4 (May 13, 1998) [hereinafter "McNair III Decl."]. Based on these estimates, it is clear that compliance with the entire requested search would require years of work.

The affidavits filed by the FBI lead to a similar conclusion. When plaintiffs made the identical search request in 1994, the FBI explained that:

> The scope of records described in the plaintiffs' subpoena has made it necessary for the FBI to review a number of records which have no relation to the issues in this case. The task is complicated by the lack of identifying information for the individuals listed in the subpoena. Without identifying information, it is necessary for the FBI to review all records referencing identical or similar names. While the substance of the record sometimes clearly indicates whether or not the record is related to an individual named in the subpoena, this determination can not [sic] be made until after the record has been fully reviewed. In some cases, secondary research is necessary to determine if an individual named in FBI records is the same individual listed in the plaintiffs' subpoena. In other cases, there is not enough information to make a determination.

---

**11.** This estimation is relevant because plaintiffs' first subpoena is substantially similar to their expanded search request. The first subpoena was broader in that it requested all documents concerning the finances and the military training camps of the FDN, the UNO, and the RN. This

additional information is offset by the fact that plaintiffs' expanded search requests several categories of documents without reference to time; the original subpoena limited most categories of information to a four-year period from January 1, 1984, until January 1, 1989.

Decl. of Earl E. Pitts ¶ 6 (October 25, 1994). Although the FBI did not submit a specific calculation of the hours needed to comply with plaintiffs' expanded search,[12] the Court concludes that it would take the FBI almost a year just to search, review and release documents responsive to category 7.[13] Accordingly, the Court concludes that both agencies have met the heavy burden of proving undue burden, and the Court will not enforce plaintiffs' requested expanded search.

## C. Modification of Plaintiffs' Search Request

■ "[M]odification of a subpoena is generally preferred to outright quashing." *Linder v. NSA*, 94 F.3d 693, 698 (D.C.Cir.1996); *Northrop*, 751 F.2d at 403. The FBI has suggested performing a search for the following documents (based on category 7 of plaintiffs' proposed expanded search):

All documents generated between April 1, 1986, and April 30, 1988, concerning the policies and practices of the following contra organizations towards civilians, wounded, prisoners of war, and foreigners working in Nicaragua:

Nicaraguan Democratic Force

Unified Nicaraguan Opposition

Nicaraguan Resistance

Feightner Decl. ¶ 4. This modified search would capture most of the documents relevant to plaintiffs' second and third theories of their case and within the scope of the Court of Appeals' remand. The Court further agrees with the FBI that the time limits on the modified search are reasonable, covering

approximately a year before to a year after Benjamin Linder's death.

The CIA, however, objects to even this more limited search. The most recent McNair declaration explains that the agency composed a search for the years 1985–1987 using the search elements "Nicaraguan Democratic Force (FDN)," "Nicaraguan Resistance (RN)," "Unified Nicaraguan Opposition (UNO)," "civilians and Nicaraguan," "prisoner of war and Nicaraguan," "wounded and Nicaraguan," and "foreigners" in the DO databases[14] and

[b]ased upon these search terms the total number of documents located in the DO databases were 55,590 documents. The estimated time it would take to search these documents by hand for responsive information is 7,572 person-hours. If CIA were required to perform the same search in the databases of its other three components the number of person-hours involved would be significantly greater.

McNair III Decl. ¶ 4. McNair further explained that:

There are a limited number of DO employees who are experienced in and available to conduct research requests for intelligence or other reasons, including litigations; therefore, the amount of effort required for the DO to meet the broad demands of the additional search requests would significantly hamper its ability to conduct other records searches not only in fulfillment of its intelligence mission, but also in support of law enforcement investigations and prosecutions, Freedom of Information Act and Privacy Act requests, Congressional

---

**12.** The FBI did estimate that it would have to expend between 1,530 and 2,142 man-hours just to determine the universe of documents responsive to plaintiffs' original motion for further relief. *See* Decl. of Paul C. Cignoli, Jr. ¶ 7 (Oct. 24, 1995).

**13.** The FBI, in its most recent affidavit, states that in order to complete the retrieval, review, and processing of FBI documents responsive to a search encompassing category 7 for a two-year period, they would need sixty days. *See* Decl. of Margaret A. Feightner ¶¶ 4–5. The FBI generally serializes and maintains documents in chronological order, *id.* ¶ 6, thus any increase in the requested time period necessarily increases the number of documents which must be reviewed

for responsiveness. Because plaintiffs have not suggested any time limitation for their search, compliance with their request would require the FBI to search records for at least twelve additional years. The Court notes that the Court of Appeals' observation that "the district court cannot assume that the burden on one agency will be the same as the burden on another," *Linder*, 133 F.3d at 24, does not bar this conclusion, especially in light of the "wide latitude" a district court enjoys when resolving discovery disputes. *See id.*

**14.** McNair indicated that the DO databases are the most likely to contain relevant documents. McNair III Decl. ¶ 4.

demands for information, and other civil litigations, for a lengthy period of time. *Id.* at ¶ 27.

The CIA has not met its heavy burden of proving that the search as modified would be unduly burdensome. The modified search is narrow enough to ensure that the documents it will generate will be relevant to the second and third theories of plaintiffs' Florida case. The CIA has not demonstrated that plaintiffs can get the same information from other sources. *See* Fed.R.Civ.P. 26(b)(2). Although the CIA indicates that "a very high percentage of the documents that will be retrieved from the DO database will be classified," McNair III Decl. ¶ 28, the CIA has not asserted that the search would be fruitless due to the volume of classified material. *See Northrop,* 751 F.2d at 404–406. Finally, "volume alone is not determinative" in the undue burden analysis. *Id.* at 404. The CIA's estimate of the length of time it would take to perform such a search would carry more weight if the agency had explained why it did not include in its search the limitation "Nicaraguan contra" or "contra" as opposed to only "Nicaraguan"; it is the contra policies, not the Nicaraguan policies, in which plaintiffs are interested.[15]

### D. The CIA's Request that Plaintiffs Pay for the Search

█ Finally, the CIA contends that, pursuant to its *"Touhy"* regulation at 32 C.F.R. pt. 1905 and Federal Rules of Civil Procedure 26(c)(2) and 45(c), the Court should require plaintiffs to compensate the agency for the expense of complying with their request. Although the Court does not see the relevance of the CIA's *Touhy* regulation to this issue, Rule 45(c)(2)(B) states that "an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded." Fed.R.Civ.P. 45(c)(2)(B). Thus, because the CIA is not a party to the underlying lawsuit and has made a timely motion, the Court concludes that it is required to protect the CIA from the significant expense necessitat-

ed by plaintiffs' search request. *See In re Midlantic Corp. Shareholder Litigation,* 1994 WL 750664 at *6 (D.D.C.1994); *In re Exxon Valdez,* 142 F.R.D. 380, 383 (D.D.C. 1992); *see also Tutor–Saliba Corp. v. United States,* 32 Fed.Cl. 609, 611–612 (1995) (holding that when a nonparty indicates its intention to seek costs as a condition to responding to a subpoena, if the court orders the nonparty to comply, its order must protect the nonparty from significant expense).

█ "[P]rotection from significant expense does not mean that the requesting party necessarily must bear the entire cost of compliance." *Exxon Valdez,* 142 F.R.D. at 383. Relevant factors in determining how much of the expense of production the requesting party should bear includes whether the non-party actually has an interest in the outcome of the case, whether the non-party can more readily bear its costs than the requesting party, and whether the litigation is of public importance. *Id.* (citing cases). Although the Court notes that it is sometimes appropriate to require a plaintiff to bear the full cost of a non-party government agency's compliance with a subpoena, *see Midlantic Corp.,* 1994 WL 750664, at *6 (requiring plaintiff to pay the reasonable copying and labor costs related to the Office of the Comptroller of Currency's compliance with a nonparty subpoena), in light of the CIA's resources and the significance of plaintiffs' Florida litigation, the Court concludes that conditioning the CIA's compliance with the modified search on plaintiffs' payment of half the reasonable copying and labor costs will sufficiently protect the agency from "significant expense."

### CONCLUSION

For all the foregoing reasons, plaintiffs' motion for an expanded search is denied in part and granted in part in modified form. An appropriate Order for each case accompanies this Opinion.

### *ORDER*

For the reasons stated in the accompanying Opinion, it hereby is

---

**15.** The CIA has previously indicated that including "contra" as a search term would limit the

number of documents generated. *See* Declaration of William H. McNair ¶ 11 (Oct. 26, 1994).

ORDERED, that plaintiffs' motion for an expanded search is granted as modified and denied in part. It hereby further is

ORDERED, that, on the condition that plaintiffs agree to pay half of the reasonable labor and copying costs, the Central Intelligence Agency ("CIA") shall comply with a subpoena which covers the following information:

All documents located in the Directorate of Operations' databases generated between April 1, 1986, and April 30, 1988, concerning the policies and practices of the following contra organizations towards civilians, wounded, prisoners of war, and foreigners working in Nicaragua:

Nicaraguan Democratic Force

Unified Nicaraguan Opposition

Nicaraguan Resistance.

It hereby further is

ORDERED, that within 21 days of this Order, the CIA shall supply plaintiffs with the estimated labor and copying cost of compliance with the modified subpoena. It hereby further is

ORDERED, that within 28 days of this Order, the parties shall file with the Court a joint status report setting forth dates by which the CIA may be expected to comply with the subpoena.

SO ORDERED.

### ORDER

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that plaintiffs' motion for an expanded search is granted as modified and denied in part. It hereby further is

ORDERED, that the Federal Bureau of Investigation ("FBI") shall comply with a subpoena which covers the following information:

All documents generated between April 1, 1986, and April 30, 1988, concerning the policies and practices of the following contra organizations towards civilians, wounded, prisoners of war, and foreigners working in Nicaragua:

Nicaraguan Democratic Force

Unified Nicaraguan Opposition

Nicaraguan Resistance.

It hereby further is

ORDERED, that the FBI shall complete the retrieval, review, and processing of any FBI documents responsive to the foregoing search within 60 days of the date of this Order.

SO ORDERED.